[Civ. No. 11935. Second Appellate District, Division One.—July 1, 1940.]

CHONITA P. LARAWAY, Appellant, v. FIRST NATIONAL BANK OF LA VERNE (a Corporation) et al., Respondents.

Frank D. Healy for Appellant.

Nichols, Cooper & Hickson, A. L. Hickson and Allard, Whyte & Brownsberger for Respondents.

WHITE, J.—This action was begun by the appellant on the ninth day of June, 1937, and thereafter an amended complaint was filed on September 15th of the same year, for the purpose of recovering damages, exemplary damages and interest, resulting from the alleged fraud of respondents in the sale by them to appellant of certain securities, the purchase of which, it is alleged, was induced by fraudulent repre-

sentations made by respondent bank acting by and through its cashier, respondent E. H. Boly.

Epitomizing the facts as disclosed by the record, it appears that appellant had resided at La Verne in the county of Los Angeles all her life, was married in 1920, of which marriage one son was born in 1921. Appellant's husband died October 24, 1930. During her married life appellant's only occupation was that of housewife; since 1934 she has been employed by a pump company as Spanish translator and stenographer. According to her testimony, she was inexperienced in business and financial matters. Appellant became acquainted with respondent Boly in the latter's capacity as cashier of respondent bank in 1923. Continuously from January, 1929, to 1936, appellant had maintained a savings account with respondent bank. On December 15, 1930, shortly after the death of her husband, appellant received from the United States Government the proceeds of her husband's insurance policy in the sum of approximately $10,073. On the day she received the government insurance money appellant repaired to respondent bank to deposit the same in her savings account. At the bank appellant encountered respondent Boly, and what then transpired is thus narrated in her testimony:

"Mr. Boly was at the window and I gave it to him. He took it and I told him that was all I had. I also told him I had to invest that money in order to have an income for my boy and myself. He then said to me, 'Would you like to buy some bonds, invest it in bonds?' And I said, 'Yes, I would if you could get me some good, safe bonds,' and he said he thought he could and that he would let me know whenever he got the bonds for me. I thanked him and left the bank then. After he entered the amount in my savings bank book I took it and left and he told me he would let me know whenever the bonds came in."

Two days later respondent Boly telephoned appellant that he had procured the bonds for her and requested her to call at the bank, with which request she complied, when, according to appellant's testimony, the following occurred:

"He brought these bonds out to me and he told me they were American Natural Gas Corporation and American Commonwealth Power Corporation. He gave me the per cent of each one—one was 6½ and the other 5½—and then he pulled out a blank check to use to draw my savings, to draw the

amount out of my savings account, and I signed it for the amount of $10,105.42. I again asked him if they were good bonds and he said yes, that they were safe bonds, so I took them. He handed me the bonds and I took them and he told me to place them in my safe deposit box, which I did at the time he mentioned it. Just as he gave me the bonds and I was going away from the window he said, 'Now, at any time you want to get your money back, Mrs. Laraway, the bank will be glad to take the bonds back.' "

The amended complaint sets forth in three causes of action the various transactions had with respondents. The first cause of action alleges that on December 17, 1930, the appellant purchased from the bank certain debentures of American Commonwealth Power Corporation of the face value of $5,000 and paid therefor the sum of $5,000 and accrued interest of $35.91, aggregating $5,035.91 (these debentures at that time had a ready "over-the-counter" market of 68 cents on the dollar, or $3,400). The second cause of action charges that on the same date and at the same time appellant purchased from the bank certain debentures of the American Natural Gas Corporation of the like face value of $5,000 and paid therefor the sum of $5,000 and accrued interest of $69.51, aggregating $5,069.51 (these debentures had at that time a ready market on the New York Curb Exchange of 28 cents on the dollar, or $1400). The third cause of action sets forth that on July 30, 1931, appellant purchased from respondent bank a leasehold bond of the Alexandria Hotel Realty Corporation of the face value of $1,000 and paid therefor the sum of $1,000, the market value of this leasehold bond at the time of purchase being 71 cents on the dollar, or $710.

It thus appears from the allegations of the amended complaint that the total price paid for the three securities was $11,000 exclusive of $105.42 accrued interest, while the true total market value of such securities was only $5,510, or an average discount of 50 cent on the dollar. The basis for recovery of damages therefore sounds in fraud and misrepresentation, the character of which misrepresentation and concealment of respondent bank, acting through the medium of its cashier, respondent Boly, is thus set forth by appellant:

"1. That the securities sold to the appellant (except the Alexandria Hotel Realty Corporation leasehold bond) had been purchased by the bank for the appellant, when in fact

the securities had been owned by the bank for two and one-half years.

"2. That the securities sold were bonds, when in fact the securities (except the Alexandria Hotel Realty Corporation leasehold bond) were debentures and were 'simply a note'.

"3. That the securities were 'good, safe bonds'; were selling at par on the market; that the fair, reasonable and actual value was par; and that the securities met the requirements and needs of the appellant as a proper investment for her under her circumstances, when in fact the securities were selling at sixty-eight, twenty-eight and seventy-one cents on the dollar as the defendants well knew.

"4. That it was the best advice and counsel of respondents that the appellant should purchase the securities, when in fact the bank was intentionally unloading unsafe securities on an unsuspecting purchaser."

It is disclosed by the record that the above-mentioned American Natural Gas Corporation, following the payment of interest on its debentures due April 1, 1931, defaulted in the payment of the interest due October 1, 1931. The American Commonwealth Power Corporation, following payment of interest on its debentures due May 1, 1931, and November 1, 1931, defaulted in the payment of interest due May 1, 1932. Both corporations were subsequently reorganized, and in November, 1932, the appellant, after consultation with respondent Boly and by reason of his advice, exchanged the American Natural Gas Corporation debentures for other securities pursuant to the plan of reorganization, and in September, 1934, according to appellant's testimony, after consultation with respondent Boly and acting upon his advice, she exchanged the American Commonwealth Power Corporation debentures for other securities pursuant to a plan of reorganization. It is not contended, nor does the record indicate, that appellant had any actual knowledge that any of the securities were not selling at par at the time she purchased them, and she did not obtain such information until the summer of 1936.

Trial was commenced before the court sitting with a jury, but when appellant had concluded the presentation of testimony a nonsuit was granted solely and alone on the ground that the action was barred by the provisions of subdivision 4 of section 338 of the Code of Civil Procedure, in the course of which decision the trial court said:

"The evidence as to fraud in this case is that the bank sold bonds—Mr. Boly as cashier of the bank sold bonds to the plaintiff at par and concealed from her the fact that they were worth less than par, and that she went to Mr. Boly as her confidential adviser. That is the real meat of this action, the concealment of the market value of the bonds, rather than the misrepresentations as to the par value. If a confidential relationship existed, that concealment is sufficient to constitute fraud, *and for the purpose of this motion I am perfectly willing to hold that it does constitute fraud and there was fraud on the part of Mr. Boly.* However, that took place in 1930, and there is a three-year statute of limitations on an action for damages for fraud. The three years, however, would not begin to run until the plaintiff had notice of some fact or circumstance which would put her on inquiry or arouse her suspicion. In 1931 the evidence shows, the fall of 1931, there was a default in the payment of interest on these bonds; subsequently the company was reorganized. There is no doubt that the failure of a company to pay interest on these bonds and the subsequent reorganization of the company is sufficient to cause suspicion, to arouse the suspicions of any one as to the value of those bonds. . . . In so far as three years had expired since that time the statute has run and the action is barred, because it was not filed until June of 1937. . . . "

However, the evidence in this case discloses that upon the failure of the two corporations to pay the interest on their debentures, as well as upon the occasion of their subsequent reorganization, appellant throughout consulted with respondents and by them was advised, and according to her testimony she believed such advice, which was to the effect that the defaults and reorganizations were due to the depression; that her situation was no different from that of other investors who had suffered losses through the universal economic conditions then existing; and further, that the reorganizations in question did not necessarily mean that appellant would suffer any loss. Indicative of the type of advice and counsel appellant was receiving from respondents is the following letter addressed to the former by respondent Boly, written upon respondent bank's stationery and dated May 11, 1932, some two years following appellant's original transaction with the bank:

"Dear Mrs. Laraway:

"The other day you were in and clipped the coupons from your American Commonwealth Power Corporation bonds amounting to $137.50, which has been returned to us with the notation: 'No Funds'. This came back to us through our corresponding bank in Los Angeles from the New York Trust Company in New York. *From the information we have been able to gather from the bond house through which we purchased these bonds for you,* the Company's earnings have fallen off and they are not paying their interest at this time to safeguard their business. In as much as world wide business conditions have been so depressed, all the companies, the big companies all over the world as well as the smaller ones, have felt the depression and have had to take some action to safeguard their interest. Then, too, they are required to set up a certain reserve for depression and any other contingency that might arise so that they can continue in business and not be forced into bankruptcy.

"We have asked for a complete report in this connection and will keep you informed as to the plans the company is working under. It is the general opinion that the next ninety days should show quite an improvement in business conditions in general over that of the first ninety days of this year. A great many companies and the entire world have been following the action taken by our government relative to the balancing of the budget for the expenditures of our own government. By reason of this uncertainty that has prevailed due to the work of the politicians of Washington, D. C., it has thrown a damper on all business, and as I mentioned previously, has had a very drastic, depressing effect on all business. Nevertheless, the only sane thing to do is to assist in any way possible and hope for the best because the world has never gone through such a condition as now prevails. And too, there is no one exempt from this depression. It has effected all, both large and small. We are enclosing the coupons with your bonds so they will not be misplaced and so that you might know just where they are when we receive word to send them in."

We might here pause to say that the statement contained in this letter advising appellant that "from the information we have been able to gather from the bond house through which we purchased these bonds for you" was a bare false-

hood and deception, because it is an admitted fact in this case that respondent bank was itself the owner of the securities sold to appellant, did not obtain them from any bond house for her, and respondent bank had as a matter of fact owned the securities for approximately two and one-half years previously.

It is conceded that the sole and only question presented to us for decision on this appeal is whether the appellant as a matter of law was chargeable with a ''discovery'' . . . of the facts constituting the fraud . . . '' more than three years prior to the filing of the action. (Code Civ. Proc., sec. 338, subd. 4.) Respondents contend that appellant was in possession of knowledge of sufficient facts which, if she had used ordinary care or prudence, or had made even casual inquiry, would have led to discovery of the alleged frauds prior to the passing of three years from the time of the transactions between the parties in 1930. In the main, this claim is based upon the fact that in her original complaint appellant admitted knowledge of the receivership proceedings in connection with the defaulting corporations and consented thereto in the latter part of 1931; that, as respondent argues, ''she knew something was wrong, or at least she must of necessity have concluded that the value of the bonds were in question when they defaulted in payment of interest on May 1, 1932''. With these claims of respondent we cannot agree. ■ This being an appeal from a judgment of nonsuit, we must examine the trial court's ruling in the light of the uniform decisions of this state, too numerous to warrant a cause for citation, all of which hold, in effect, that every inference of fact and intendment of law must be liberally construed in favor of sustaining the case made by plaintiff, to the end that causes may be determined upon their merits. ■ That respondents were guilty of false and fraudulent representations cannot be denied. They were acting as agents of appellant to obtain for her what they characterized as ''good, safe bonds'', and instead they sold her securities which were principally unsecured debentures owned by them and charged her the par value thereof when they knew that the securities were selling at about half their par value. As agents of appellant the respondents were bound to exercise the utmost good faith to make the best bargain fairly obtainable for their principal.

In this obligation which they owed to appellant respondents failed miserably.

■ Let us now review the course of conduct on the part of appellant to determine whether it supplied evidence of imprudence and negligence upon her part so conclusive that reasonable minds could not differ as to the existence thereof. Following the death of her husband and the receipt of his insurance money, she went to respondent bank, where she and her husband had done business. She went there for the purpose of investing the insurance money that she had received. She trusted respondent Boly, the cashier of the bank, whom she had known over a period of years, to advise and assist her in making the desired investments so that, as she said, she and her son might have some income upon which to live. Subsequently, when the investments defaulted in payment of interest, she went back to the bank to inquire the reason therefor. While the occurrence of such defaults might prompt her to question the soundness of respondent Boly's judgment, surely it was no ground for her to question the integrity of the same. She inquired the reason for the defaults in the payment of interest, and respondents, still concealing from her the fact that they had sold her bonds at par when the same were upon the market at prices much less than par, informed her both in conversations and by letter that the failure of the corporation did not necessarily mean she would lose her money, and that these reorganization plans were due entirely to the business depression. That appellant relied upon respondents' representations and believed in the integrity thereof is indicated by the fact that she continued to apply to respondent Boly for advice and continued to keep her account in the bank until in 1936 she met the witness Robert P. Gibson, who was engaged in the investment security and industrial loan business, and who had many years' experience in buying, selling and dealing in stocks, bonds and securities. To Mr. Gibson appellant imparted the information concerning her purchase of the securities from respondent bank, and the former told her he would make an investigation concerning the same. A short time later Mr. Gibson contacted appellant and advised her that at the time respondents sold her the American Commonwealth Power Corporation securities at par the same were selling at 68 cents on the dollar; that American Natural Gas

Corporation debentures sold by respondents to appellant at par were selling at that time for 28 cents on the dollar, and that the Alexandria Hotel Realty Corporation bond, which respondents had sold appellant at par, was at the time of such purchase selling at a price less than par. Approximately one year thereafter appellant filed this action. May it not reasonably be inferred from the foregoing that by respondents' conduct toward her, appellant was lulled into a sense of security in the belief that by following the advice of her banker she would probably recoup her losses? Pertinent indeed to the facts of this case is the language found in *Victor Oil Co.* v. *Drum*, 184 Cal. 226, 241 [193 Pac. 243], as follows:

"The courts will not lightly seize upon some small circumstance to deny relief to a party plainly shown to have been actually defrauded against those who defrauded him on the ground, forsooth, that he did not discover the fact that he had been cheated as soon as he might have done. It is only where the party defrauded should plainly have discovered the fraud except for his own inexcusable inattention that he will be charged with a discovery in advance of actual knowledge on his part. The present case is not of that character."

▪ Courts will not put their *imprimatur* upon a possible but antiquated authority that a person must assume that everyone with whom he has a business transaction is a rogue and act accordingly, but rather will hold that one can act upon the presumption that there exists no intention to cheat or defraud him. (*Tidewater Southern Ry. Co.* v. *Harney*, 32 Cal. App. 253, 260 [162 Pac. 664]); or as was said in *Tracy* v. *Smith*, 175 Cal. 161, 165 [165 Pac. 535], "the fraudulent vendor cannot escape from liability by asking the law to applaud his fraud and condemn his victim for his credulity"; and again, in *Togni* v. *Taminelli*, 11 Cal. App. 7, 14 [103 Pac. 899], we find the following: "No one has a right, either in law or in morals, to complain because another has placed too great reliance upon the truth of what he himself has stated."

▪ We hold that the evidence in this case is reasonably susceptible of the conclusion that there existed a continuing confidential and fiduciary relationship between the parties commencing with the time in 1930 when appellant first purchased securities through the respondent bank up to the discovery of the misrepresentations in 1936. We are satisfied

from the evidence before us that the delay upon appellant's part about which respondents complain was induced by their own representations to her, and that by reason thereof, even though we concede that the statute of limitations commenced to run as contended for by respondents, they were estopped from taking advantage of the statute. In *Calistoga Nat. Bank* v. *Calistoga Vineyard Co.*, 7 Cal. App. (2d) 65, 72 [46 Pac. (2d) 246], it is said: "It is a well-established rule of law that when the act or promise of one person causes another in reliance thereon to do or forbear from doing a thing to his detriment, which he would have otherwise performed, the promisor is estopped from taking advantage of the act or omission of the promisee. The violation of such a promise amounts to fraud and estops the promisor from repudiating the agreement on the ground of equitable estoppel." Respondents not only falsely represented that they had procured the securities "from a bond house", when in fact respondent bank had owned them for two and one-half years; they not only falsely represented that the securities were bonds, when in fact, with the exception of the Alexandria Hotel Realty Corporation bond, they were merely unsecured corporation debentures; not only impliedly represented by reason of their confidential relationship with appellant that such securities were selling at par on the market, when in fact, as known to respondents, they were selling at 68, 28 and 71 cents on the dollar; not only represented that the securities met the requirements and needs of appellant under her circumstances— but after default in the payment of interest on the securities, respondents continued to advise and counsel appellant to exchange her securities for reorganization stocks and to tell her that the drop in prices on her securities was due to the depression, when in fact such securities had been selling below par at the time respondents sold them to her. ▮ This course of conduct on the part of respondents created an equitable estoppel, for it is the rule that when a defendant electing to set up the statute of limitations has previously by deception or any violation of duty toward the plaintiff caused the latter to subject his claim to the statutory bar, he must be charged with having wrongfully obtained an advantage which the courts will not allow him to hold. (37 Cor. Jur. 725, 726.) Where, as here, the delay in commencing action was induced by the conduct of the offending party, it cannot be availed

of by the latter as a defense. (*Mitchell* v. *J. H. Roth & Co.*, 124 Cal. App. 96, 99 [12 Pac. (2d) 91].) The rule is thus stated in *Verdugo Cañon Water Co.* v. *Verdugo*, 152 Cal. 655, 683 [93 Pac. 1021]: "An estoppel may arise although there was no designed fraud on the part of the person sought to be estopped. . . . An estoppel may arise also from silence as, well as words." To create an equitable estoppel, "it is enough if the party has been induced to refrain from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss." (2 Pom. Eq. Jur., 4th ed., sec. 812, p. 1671.)

▮ The fact, as urged by respondents, that means of knowledge were open to appellant, does not necessarily debar her from relief. It is only when the circumstances are such that inquiry becomes a duty that the failure to make it becomes a negligent omission. (*Denson* v. *Pressey*, 13 Cal. App. (2d) 472, 476, 477 [57 Pac. (2d) 522].) We find nothing in the evidence here that would excite the suspicions of an ordinarily prudent person situated as appellant was or that would put him on inquiry. ▮ Even if we concede that some of the representations made by respondents related more or less to matters of opinion, nevertheless expressions of opinion, to avoid an action for deceit or fraud, should be of an opinion honestly entertained by the person making the same (*MacDonald* v. *De Fremery*, 168 Cal. 189 [142 Pac. 73]; *Phelps* v. *Grady*, 168 Cal. 73 [141 Pac. 926]; *Barron Estate Co.* v. *Woodruff Co.*, 163 Cal. 561 [126 Pac. 351, 42 L. R. A. (N. S.) 125]); and whether representations are of a fact or matters of opinion depends largely on the circumstances. (*Hall* v. *Mitchell*, 59 Cal. App. 743 [211 Pac. 853]; *Hodgkins* v. *Dunham*, 10 Cal. App. 690 [103 Pac. 351].) As was said in *Zwart* v. *Landfield*, 93 Cal. App. 328, 333 [269 Pac. 740]:

" . . . Moreover, the expression of opinion may amount to fraud where it is accompanied by active misrepresentations or concealment, or where it relates to a subject as to which the parties have no knowledge or means of ascertaining the truth. . . . The general rule is that one has a right to rely on statements of material facts essentially connected with the substance of the transaction where one of the parties is ignorant or inexperienced in regard to matters concerning which material representations are made, and such ignorance is known to the other party, who is also aware that reliance is being

placed on his representations, and that the facts are not, and cannot be expected to be, within the first party's knowledge (12 Cal. Jur. 754 and cases cited); and if one material statement be false it is sufficient ground for rescission. (*Beeman* v. *Richardson,* 185 Cal. 280 [196 Pac. 774].) . . . ''

Under the familiar rules governing the power of the court in passing upon a motion for a nonsuit, such motion should have been denied in the instant case. Before we can affirm the judgment in this case we must say as a matter of law that no reasonable conclusion or inference can be drawn from the evidence except that appellant had ample knowledge of facts which should have put her on inquiry before three years had elapsed from the time of the transactions in 1930, or we must say that the evidence adduced in favor of appellant is so incredible or so lacking in support that if appellant had recovered a judgment we would be compelled to reverse it on appeal. The facts of this case as outlined do not permit us to say either the one or the other, and would not permit us to do the latter.

We find no error in the rulings of the trial court on the admission of evidence as to other and similar transactions upon the part of respondents, sought to be shown on the theory that they were admissible to prove the fraud alleged in connection with the transaction under investigation.

It should be understood that this opinion is written in the light of the rule applicable to cases where the appeal is taken from a judgment following a directed verdict or nonsuit, and by which rule the appellate tribunal is required to take the evidence in the most favorable light to the losing party in the court below. As to the weight of the evidence or its truth or falsity, we are expressing no opinion.

The attempted appeal from the order granting the nonsuit is dismissed for the reason that such appeal is not authorized and the order is reviewed on the appeal from the judgment entered upon said nonsuit.

For the reasons herein stated, the judgment is reversed and the cause remanded for a new trial.

York, P. J., and Doran, J., concurred.